[No. G009348. Fourth Dist., Div. Three. May 29, 1991.]

CLYDE LACHER et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
SOUTHWEST DIVERSIFIED, INC., et al., Real Parties in Interest.

COUNSEL

Daryl J. Paul for Petitioners.

No appearance for Respondent.

Hamilton & Samuels, Paul R. Hamilton, Jeffrey S. Grider, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., Steven L. Mayer and Annette L. Hurst for Real Parties in Interest.

## OPINION

**MOORE, J.**—Petitioners Clyde and Maurine Lacher seek review of an order sustaining a demurrer, without leave to amend, to causes of action for fraud and negligent misrepresentation in an action arising out of a residential development being built near their home. They allege the developer fraudulently induced their support and acquiescence to obtain the required governmental approval for the project. We conclude the trial court erred in holding

the facts alleged in the first amended complaint failed to establish the developer owed a duty of care to petitioners.

In addition, we reject claims by the real parties in interest that the amended complaint does not adequately allege justifiable reliance or proximate cause, and that the causes of action are barred by either the Planning and Zoning Law (Gov. Code, § 65000 et seq.), the Subdivision Map Act (Gov. Code, § 66410 et seq.), or the statute of frauds (Civ. Code, § 1624). We emphasize that, notwithstanding the repeated characterizations made by real parties and our dissenting colleague, this case involves an action based on false representations allegedly made to petitioners. It does not involve an action against any governmental body or agent thereof, nor is it grounded on any alleged misrepresentation made to a governmental body or agent.[1]

## FACTS

Extraordinary relief is generally not granted at the pleading stage. But an appellate court can do so when it concludes the trial court has deprived a party of an opportunity to plead his or her cause of action or defense and granting the petition will prevent a needless and expensive trial and reversal. (*Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 894 [157 Cal.Rptr. 693, 598 P.2d 854]. See also *Freedman* v. *Superior Court* (1989) 214 Cal.App.3d 734, 735-736 [263 Cal.Rptr. 1].) We are required to assume the truth of all properly pleaded material allegations contained in the amended complaint, give it a reasonable interpretation by reading the pleading as a whole and all of its parts in context, and are prohibited from considering whether petitioners will be able to prove their allegations or the possible difficulty in doing so. (*Garcia* v. *Superior Court* (1990) 50 Cal.3d 728, 732 [268 Cal.Rptr. 779, 789 P.2d 960]; *Phillips* v. *Desert Hospital Dist.* (1989) 49 Cal.3d 699, 702 [263 Cal.Rptr. 119, 780 P.2d 349]; *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 162, fn. 2 [216 Cal.Rptr. 661, 703 P.2d 1]; *Freedman* v. *Superior Court, supra,* 214 Cal.App.3d at p. 736.)

Petitioners allege they own and live on property located in Dana Point, California and are "novices in the building and development industry." Real party in interest Southwest Diversified, Inc. (Southwest) owns approxi-

---

[1]Our dissenting colleague accuses us of creating a new tort he refers to as "developer fraud." (Dis. opn., *post,* p. 1053.) The first two causes of action of petitioners' amended complaint constitute forms of an action for fraud. This action is of common law origin. (Prosser & Keeton, the Law of Torts (5th ed. 1984) § 105, pp. 727-728.) Although the right to recover damages for fraud is codified in Civil Code sections 1709 and 1710, first enacted in 1872, these statutes are merely declarative of the common law. (Civ. Code, § 5.) The suggestion in the dissent that a developer cannot commit fraud is both ludicrous and laughable.

mately 25 acres of land in Dana Point located across the street from and generally southeast of petitioners' residence.

Prior to the City of Dana Point's incorporation, the County of Orange prepared an environmental impact report covering the Dana Point area and adopted the Dana Point Specific Plan (DPSP). Both the report and DPSP recognized one of the area's primary natural resources was its scenic views of the harbor, coast and mountains. The area where petitioners' property is located was designated as having a "secondary view-potential primary inland view," facing in a generally southeasterly direction.

In conformity with the DPSP, land use regulations were adopted restricting the nature and type of development permitted in Dana Point. The regulations covering Southwest's property imposed limitations that included minimum building site area, building width and height restrictions, and building setback requirements.

Seeking to build a residential development on its Dana Point property, Southwest filed a tentative tract map with the county's environmental management agency, and applied for a use permit, zoning permit, and a coastal permit. By applying for these permits, Southwest subjected its project to a public hearing review process before the DPSP board of review, and the Orange County Planning Commission, among others.

Southwest's development proposal requested certain concessions it was not otherwise entitled to receive and to which there was substantial opposition in the neighboring community. To achieve the necessary approval, Southwest actively solicited the support of nearby residents, including the petitioners. The neighbors' primary concerns lay in protecting their views. During the latter part of 1987 through the summer of 1988 Southwest, through its agents Richard Garlinghouse and Mark Buell (sometimes collectively referred to as Southwest), conducted and attended several meetings with interested neighbors.

Southwest's agents allegedly misrepresented material facts relating to the project. At a November 1987 meeting, Buell promised he would try to satisfy petitioners' request that Southwest build on the natural, existing grade of the property along Calle La Primavera, the street between petitioners' and Southwest's lots. At a meeting held January 9, 1988, Buell stated the houses built along that street would be limited to one story above street level.

During two subsequent meetings, Southwest's agents asserted the homes built in the development would be erected on the natural, existing grade,

without using fill dirt, set back from the street some 25 feet, and situated to maximize petitioners' view. On both occasions, Garlinghouse accompanied petitioners to the lots directly across the street from their property and pointed out where structures would be located.

At another meeting, Garlinghouse claimed no structure built on Southwest's property would exceed one story in height above the street level of Calle La Primavera. Also, during the permit approval process, Southwest represented to the county's planning commission it would (1) provide split-level building pads and step-down units to preserve the natural form of the property's terrain, and (2) limit homes along Calle La Primavera to single-story plans using structural designs that preserved the views of nearby residents.

In reliance on Southwest's representations, petitioners acquiesced in the development plans and, at hearings before the DPSP review board and the county's planning commission, recommended approval of the project. Only after the project was approved and construction began did petitioners discover the alleged fraud. They assert all of the representations that the project would be built to protect and preserve their view were false; that Southwest had no intention of building on the existing grade, but had planned to bring in fill dirt to raise certain sites and did so; that the promised one-story homes are in fact significantly higher; and that Southwest exploited the property's terrain to increase its view potential without consideration of the harm to the views of petitioners and others.

Petitioners allege that if they, other residents, and the administrative review agencies had known the true facts about the development, "approval of the then proposed project would not have been obtained by . . . Southwest without conditions imposed" protecting the views of nearby residents. As a result, petitioners have been deprived of "substantial ocean, coastline and mountain views from their residence that are otherwise protected under the DPSP," causing a diminution in their property's value and severe emotional distress.

The court sustained Southwest's demurrer to petitioners' first amended complaint with leave to amend causes of action for injunctive relief and unfair business practices. But as to fraud and negligent misrepresentation counts, the trial court sustained the demurrer without leave to amend, concluding Southwest owed petitioners no "duty." Petitioners seek an order directing the trial court to overrule the demurrer or, at least, allow them an opportunity to amend the complaint.

## DISCUSSION

### I

██ The trial court did not distinguish between the fraud and negligent misrepresentation causes of action, concluding Southwest did not owe petitioners a duty of care. As we shall explain, Southwest had a duty to refrain from making intentional and negligent misrepresentations in this factual context.

Civil Code section 1709 proscribes deceit generally: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Civil Code section 1710 delineates four types of deceit: "A deceit, within the meaning of the last section, is either: [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true; [¶] 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or, [¶] 4. A promise, made without any intention of performing it."

██ Intentional fraud is actionable because of the knowing intent to induce someone's action to his or her detriment with false representations of fact. "Fraud is an intentional tort, and the element of fraudulent intent, or intent to deceive, distinguishes it from actionable negligent misrepresentation and from nonactionable innocent misrepresentation . . . ." (5 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 677, p. 127. See also *Gagne* v. *Bertran* (1954) 43 Cal.2d 481, 488 [275 P.2d 15].) It is the element of intent which makes the fraud actionable, irrespective of any contractual or fiduciary duty one party might owe the other.

For example, our Supreme Court upheld an action for fraud on a representation by third parties that plaintiff had no ownership interest in property when she did. (*Rogers* v. *Warden* (1942) 20 Cal.2d 286 [125 P.2d 7].) The false representation led the plaintiff to execute a quitclaim deed in another's favor. There was admittedly no contractual or fiduciary relationship between the parties. But the court rejected the argument that absent such a relationship the defendants were under no obligation to disclose facts known to them: "[T]he rule has long been settled in this state that although one may be under no duty to speak as to a matter, 'if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his

knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure.' [Citations.]" (*Id.* at p. 289.)

More recently, in *Cicone* v. *URS Corp.* (1986) 183 Cal.App.3d 194 [227 Cal.Rptr. 887], the appellate court reversed an order sustaining a demurrer to a cross-complaint filed by a defendant-attorney who was being sued by a former client for malpractice. The attorney alleged he was defrauded by the cross-defendants who were negotiating to purchase his clients' business. Specifically, the attorney alleged the cross-defendants promised they would accept a balance sheet as correct only to the seller's knowledge, when in fact that was false and the cross-defendants intended to rely on the strict warranty contained in the written purchase and sale agreement. In reliance on the false promise, the attorney advised his clients to sign the agreement. (*Id.* at p. 201.) Thereafter, he sought damages for intentional fraud when his clients sued him for malpractice based on his advice. *Cicone* reiterated the above-quoted language from *Rogers*, and held the trial court erred in sustaining the demurrer without leave to amend because of the lack of a duty, noting "inferentially everyone has a duty to refrain from committing intentionally tortious conduct against another." (*Ibid.*)

■ In that light, the trial court's ruling on the fraud cause of action was error. Although Southwest had no duty to explain or discuss the development project with petitioners, having voluntarily done so, it was obligated to truthfully explain the project. Thus, petitioners' amended complaint sufficiently pleads actionable intentional misrepresentations by Southwest.

## II

■ A contractual or fiduciary relationship is also not required before liability for negligent misrepresentation may be found. (*Garcia* v. *Superior Court, supra,* 50 Cal.3d at pp. 734-735.) A duty of care has been found in a variety of less restrictive settings.

*Hanberry* v. *Hearst Corp.* (1969) 276 Cal.App.2d 680 [81 Cal.Rptr. 519, 39 A.L.R.3d 173] validated a cause of action for negligent misrepresentation in awarding the Good Housekeeping seal of approval to a pair of allegedly defective shoes. "The fact Hearst is not in privity of contract with those who, relying on its endorsement, purchase the products it endorses, does not mean it is relieved from the responsibility to exercise ordinary care toward them." (*Id.* at pp. 684-685.) The *Hanberry* court reiterated the rule: " ' "Privity of contract is not necessary to establish the existence of a duty to exercise ordinary care not to injure another, but such duty may arise out of a voluntarily assumed relationship if public policy dictates the existence of

such a duty." [Citation.]' " (*Id.* at p. 685, quoting from *Merrill* v. *Buck* (1962) 58 Cal.2d 552, 561-562 [25 Cal.Rptr. 456, 375 P.2d 304].)

The controlling test was articulated in *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358]. There, the court held a notary public who had prepared a defective will could be held liable to the beneficiary for the resulting damage although there was no privity of contract between them. "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.* at p. 650.)

 This is a case where public policy dictates the existence of a duty of care. Southwest allegedly knew of the nearby residents' concern about the new housing project, and, specifically, the desire to protect their views. If the allegations of the amended complaint are true, the harm was foreseeable and resultant injury certain. It is claimed that had the neighboring homeowners known the truth and objected to the project during the permit review process, the required governmental approval would not have issued without modifications to protect the homeowners' views. Thus, a close connection existed between the alleged misrepresentations and the injury purportedly suffered by petitioners. Finally, there is a definitive flavor of immorality in soliciting the homeowners' support by negligent or intentionally misleading statements. Imposing liability for deceit in this context should prevent future harm. (Compare *Yanase* v. *Automobile Club of So. Cal.* (1989) 212 Cal.App.3d 468, 473-477 [260 Cal.Rptr. 513]; *Hale* v. *George A. Hormel & Co.* (1975) 48 Cal.App.3d 73, 86-87 [121 Cal.Rptr. 144].)

Adopting the controlling test from *Biakanja*, we conclude that when Southwest sought petitioners' support in the land use approval process, it had a duty to tell the truth and not negligently misrepresent the nature and scope of the project.[2]

## III

 Next, Southwest asserts petitioners failed to adequately allege they suffered injury proximately caused by its misrepresentations.

---

[2]Our ruling obviates the need to discuss petitioners' claim the DPSP imposes an actionable duty for the forms of deceit that they allege.

■ "A misrepresentation of fact is material if it induced the plaintiff to alter his position to his detriment. [Citation.] Stated in terms of reliance, materiality means that without the misrepresentation, the plaintiff would not have acted as he did. [Citation.] 'It must be shown that the plaintiff actually relied upon the misrepresentation; i.e., that the representation was "an immediate cause of his conduct which alters his legal relations," and that without such representation, "he would not, in all reasonable probability, have entered into the contract or other transaction." . . .' [Citation.]" (*Okun v. Morton* (1988) 203 Cal.App.3d 805, 828 [250 Cal.Rptr. 220].)

■ We conclude petitioners sufficiently pleaded they justifiably relied on Southwest's purported misrepresentations. Petitioners alleged they were "novices in the building and development industry." The DPSP recognized the Dana Point area's scenic views resource. Although petitioners initially opposed the development, material misrepresentations by Southwest's agents over a period of several months alleviated their concerns regarding the project's adverse effect on their views of the surrounding area. The agents' statements were corroborated by similar representations Southwest made to the planning commission relating to how homes would be constructed on the project. As a result, petitioners came to support the development as represented to them. The amended complaint also alleges Southwest needed concessions from the government agencies overseeing its development to proceed with the project. Given the initial opposition to it, Southwest arguably would not have obtained the necessary approval without the support of the nearby residents. Finally, petitioners allege they did not discover Southwest's fraud until after the time for objecting to the government's approval of the project had expired.[3]

The plaintiff must also allege and prove pecuniary or property loss. (5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 718, pp. 817-818.) Petitioners pleaded they suffered damages arising from a loss of their property's value. In addition, "[a]n action may be maintained to recover for physical harm proximately caused by a defendant's deceit." (*O'Hara v. Western Seven Trees Corp.* (1977) 75 Cal.App.3d 798, 805 [142 Cal.Rptr.

---

[3]The dissent cites several cases for the proposition petitioners could not rely on representations real parties made during the development approval process. None of the cases is even remotely relevant here. *Kaufman v. Fidelity Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 913 [189 Cal.Rptr. 818] involved a defamation action arising from a letter sent to property owners during a zoning dispute. The court found against the plaintiff holding that he was a public figure and the letter constituted statements of opinion only. *Chavez v. Citizens for a Fair Farm Labor Law* (1978) 84 Cal.App.3d 77 [148 Cal.Rptr. 278] involved false statements made during a political campaign. Plaintiffs admitted they were aware of the falsity at the time the statements were made and did not rely on them. Finally, in *Borba v. Thomas* (1977) 70 Cal.App.3d 144 [138 Cal.Rptr. 565], the plaintiffs sued defendants concerning statements expressing their opinion about a governmental agency's action in the future.

487] [tenant who was the victim of a rape allowed to sue owner for allegedly representing the apartment complex was safe]. See also *Garcia* v. *Superior Court, supra,* 50 Cal.3d at p. 735 [parole officer's statement to a woman that a parolee under his supervision would not look for her sufficient for negligent misrepresentation action by the woman's heirs after parolee kidnapped and killed her]; *Work* v. *Campbell* (1912) 164 Cal. 343 [128 P. 943] [deceit action permitted for allegedly intentional misrepresentations that caused the plaintiff's husband to desert her].) Here, petitioners claim they have suffered severe emotional distress caused by Southwest's alleged deceit. Thus, petitioners adequately alleged both personal and pecuniary injury as a result of the misrepresentations.

## IV

In the petition for rehearing, Southwest insists it raised and briefed the argument that the Planning and Zoning Law (Gov. Code, § 65000 et seq.) and the Subdivision Map Act (Gov. Code, § 66410 et seq.) precluded petitioners' causes of action for fraud and negligent misrepresentation. Even though we originally felt that argument had not been made, after reviewing the petition's arguments and authorities, we proceed to answer the argument and conclude it is without merit.

The question presented is whether a common law action for deceit against a developer by neighboring landowners is barred by legislative enactments covering governmental approval of real estate development. "The general rule is that statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject or, in other words, to 'occupy the field.' [Citations.] '[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.' [Citation.] . . ." (*I. E. Associates* v. *Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596]. See also *Pacific Scene, Inc.* v. *Peñasquitos, Inc.* (1988) 46 Cal.3d 407, 411 [250 Cal.Rptr. 651, 758 P.2d 1182].) " ' "Statutes are not presumed to alter the common law otherwise than the act expressly provides" ' [citation] and 'where the code is silent, the common law governs' [citation]. ' " [T]he common law is not repealed by implication or otherwise, if there is no repugnancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject" ' [citation]." (*Estate of Hering* (1980) 108 Cal.App.3d 88, 92 [166 Cal.Rptr. 298]. See also Civ. Code, § 22.2.)

The argument made by Southwest and the dissent is based on a factual scenario not before us. They note the Legislature has limited the

ability to challenge land development decisions by local governmental bodies. Government Code section 65009 places procedural restrictions on the issues that can be raised in a lawsuit and limits the time for filing an action and effecting service on the public agency under the Planning and Zoning Law. Government Code section 66499.37 also limits the time in which litigation must be commenced to challenge a public agency's decision relating to a subdivision.

But petitioners' action is not against either the DPSP review board or the county's planning commission for approving Southwest's development. Nor is the gravamen of the complaint grounded on misrepresentations real parties allegedly made to those bodies. The amended complaint alleges real parties made misrepresentations to petitioners which induced them to alter their position from opposing the development to supporting it. Although petitioners do allege that some of the representations made to them were repeated to the county's planning commission, such allegations are corroborative and provide an additional basis for their justifiable reliance.

Real parties' alleged fraud cannot be excused because a governmental agency approved the development. For example, if a contractor fraudulently constructed a building in a manner that violated local building code requirements, one could not reasonably argue a land owner would be precluded from suing because officials charged with ensuring compliance with the building code approved the work and issued a certificate of occupancy.

We conclude the Planning and Zoning Law and Subdivision Map Act do not preclude petitioners' action for damages based on the allegedly fraudulent misrepresentations real parties made to them.

V

We must address one other issue raised by Southwest. It claims the duty petitioners rely on is based on an unenforceable promise to protect petitioners' view that cannot support an action for fraud because (1) petitioners have no enforceable rights to their view, and (2) even if they did, the purported agreement to protect that view is an easement which must be recorded in writing to satisfy the statute of frauds.

■■■ Southwest's first argument is without merit. *Taliaferro* v. *Salyer* (1958) 162 Cal.App.2d 685 [328 P.2d 799] correctly states "easements for light and air cannot be created by implication but only by express grant or covenant." (*Id.* at p. 690.) But petitioners are not suing to enforce an easement. They are seeking damages for injuries suffered because of Southwest's alleged misrepresentations. For example, if Southwest had merely

informed petitioners that its earlier communicated intentions had changed while they still had an opportunity to resist the development, petitioners would have no basis to complain. The alleged promises conveyed no interest in the property itself.[4]

To the extent Southwest's statute of frauds argument applies to the fraud cause of action, it ignores California Supreme Court authority to the contrary. In *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18 [216 Cal.Rptr. 130, 702 P.2d 212], the court overruled a long line of cases based on *Kroger* v. *Baur* (1941) 46 Cal.App.2d 801 [117 P.2d 50], that were consistent with Southwest's argument that an oral contract to convey a view easement is unenforceable in an action for fraud. *Tenzer* concluded the unenforceability of an allegedly fraudulent promise as a contract subject to the statute of frauds does not preclude an action for fraud. (*Id.* at pp. 28-31.) The court reasoned the statute of frauds was not intended to shield or protect the perpetrators of a fraud. (*Id.* at p. 30.)[5]

Southwest's reliance on *Riley* v. *Bear Creek Planning Committee* (1976) 17 Cal.3d 500 [131 Cal.Rptr. 381, 551 P.2d 1213] is misplaced. There, the Supreme Court rejected parol evidence of an agreement between the parties that plaintiffs' property would be subject to certain building restrictions, noting a writing was necessary to satisfy the statute of frauds. *Riley* merely acknowledges the necessity of a writing to enforce restrictive covenants. As the court later explained in *Tenzer*, that is irrelevant in a fraud action.

## DISPOSITION

The alternative writ is discharged. Let a peremptory writ of mandate issue directing the superior court to vacate that portion of its February 1, 1990, order sustaining the real parties in interests' demurrer to petitioners' first and second causes of action and to enter a new and different order overruling the demurrer to the first and second causes of action.

Crosby, Acting P. J., concurred.

---

[4]Real parties claim that petitioners are attempting to enforce a view that easement more appropriately applies to the amended complaint's third cause of action for injunctive relief. However, that cause of action is not presently before us. Therefore, we need not decide the validity of that count at this time.

[5]We are not aware of any California authority deciding whether the rule stated in *Tenzer* also applies to a cause of action for negligent misrepresentation. Case law in other states is in conflict on the point. (See *Phil-Co Feeds* v. *First Nat. Bank* (1989) 238 Mont. 414 [777 P.2d 1306, 1311] [cause of action not barred]; *Daley* v. *Blood* (1981) 121 N.H. 256 [428 A.2d 900, 901] [statute of frauds barred negligent misrepresentation action based on a promise within the statute]; *Frame* v. *Boatmen's Bank* (Mo.App. 1989) 782 S.W.2d 117, 122-123 [cause of action not barred].) In view of our holding that petitioners are not suing to enforce an easement, we need not decide the question at this time.

**WALLIN, J., Dissenting.**—Read my lips! No tall houses! No blocked views! That is what petitioners, the neighborhood property owners, contend Southwest promised during meetings with them to discuss Southwest's proposed development. But, say petitioners, Southwest reneged by obtaining approval of plans to import fill dirt to raise the height of some building sites and by obtaining building permits for houses as tall as two stories. Petitioners are angry because their ocean views have been impacted to a greater degree than they expected.

The majority concludes these allegations adequately state a cause of action for a new tort which might be called "developer fraud." I believe, however, that this tort does not exist in California and, since petitioners cannot allege justifiable reliance upon the representations of Southwest, the demurrer was properly sustained. In my view, the only remedies available to petitioners are those under the applicable land use statutes. (See Planning and Zoning Law, Gov. Code, § 65000 et seq.; Subdivision Map Act, Gov. Code, § 66410 et seq.; California Environmental Quality Act, Pub. Resources Code, § 21000 et seq.)

The county's approval of the tentative tract map, development permit, conditional use permit and variance was an administrative or " 'quasi-judicial' " act. (*Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 614 [156 Cal.Rptr. 718, 596 P.2d 1134]; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 517 [113 Cal.Rptr. 836, 522 P.2d 12].) But this appellation merely establishes the standards applied by the county in acting on the application and the procedures for judicial review of its decision. (See *Horn* v. *County of Ventura, supra,* 24 Cal.3d at p. 614; see also *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 517.) It does not accurately reflect the nature of the county's, or any other agency's, land use review and approval process. (See *Pacifica Corp.* v. *City of Camarillo* (1983) 149 Cal.App.3d 168, 176 [196 Cal.Rptr. 670].)

The process by which development approvals are obtained is a political one. (*Kaufman* v. *Fidelity Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 913, 920 [189 Cal.Rptr. 818].) Vigorous political debate and long, often acrimonious, public hearings before planning commissions, boards of supervisors and city councils concerning development approvals are a common occurrence. Political candidates identify themselves as "pro-growth," "slow-growth" or "no-growth" during every election campaign. Developers and their opponents routinely lobby elected officials, their staff, and the public concerning pending development proposals. Southwest was no exception.

It would be difficult, if not impossible, to justify reliance on representations made by participants in the political process. In *Kaufman* v. *Fidelity Fed. Sav. & Loan Assn., supra,* 140 Cal.App.3d 913, it was alleged the applicant for a zone change made false, and therefore libelous, statements about an opponent of the rezoning. The court concluded the statements were not actionable because they were made while the parties were engaged in "the political process of influencing zoning officials." (*Id.* at p. 920.) Any allegedly libelous statements made during the attempt to influence that decision were merely opinions going to the merits of a matter under public scrutiny. Similarly, in *Chavez* v. *Citizens for a Fair Farm Labor Law* (1978) 84 Cal.App.3d 77 [148 Cal.Rptr. 278], the court rejected a cause of action for deceit based on misrepresentations to the electorate during a campaign against an initiative measure.

Furthermore, petitioners had no right to rely on Southwest's representations regarding what would be presented to and approved by the county. In *Borba* v. *Thomas* (1977) 70 Cal.App.3d 144 [138 Cal.Rptr. 565], the court concluded the purchaser of property could not rely on the seller's representations concerning prospective actions by a public agency. "Absent some special relationship between the parties, a private person is not entitled to rely on the opinion of another private person concerning the future decisions of a public body." (*Id.* at p. 154.)

Southwest's plans were finally approved only after several noticed public hearings. Any objections should have been presented by petitioners in the public forum. Typically these hearings are continued whenever significant objections are presented to allow the developer, the project's opponents and the public agency's planning staff to resolve the dispute. But no developer will dare to participate in any off-the-record discussions, so long as the new tort created by the majority is recognized. Any conferences with neighbors will become grist for the mill of a fraud lawsuit filed long after the development is completed if even one neighbor abhors the plan approved by the public agency. Indeed, an objecting neighbor who decides to remain blissfully ignorant by avoiding the many public forums for presenting his or her grievances will have a better fraud case than someone who attends the hearings and presents arguments opposing the development before it is approved by the planning commission, board of supervisors, city council or other public agency.

Petitioners' failure to pursue the available statutory remedies is a further reason for denying relief. The legislative scheme provides remedies under the Planning and Zoning Law (Gov. Code, § 65000 et seq.), the Subdivision Map Act (Gov. Code, § 66410 et seq.), and the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) through an action to set

aside the county's approval of the project. These statutes preclude a common law action for fraud based on the oral misrepresentations of the applicant for development approvals. A statutory remedy supplants the common law when it appears that the Legislature intended to occupy the field. (*I. E. Associates* v. *Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596].) The majority concludes that these statutory remedies are inapplicable because this action is against the developer Southwest, not the public agencies. I disagree.

A fraud action with its attendant punitive damages, even if unsuccessful, will have severe economic consequences on any project. No property owner, despite complying with every legal requirement to obtain the right to build, can rest until the fraud statute of limitations runs. Not surprisingly, the majority cites no cases holding such a tort exists in California.

The power to approve Southwest's project rests solely with the county's agencies, subject to the applicable zoning and land use laws. Petitioners do not allege the development is illegal. Apparently it conforms to the zoning and land use laws and the approvals obtained. Allowing unhappy neighbors to pursue a fraud action against a property owner for the tort of building a structure on its property which was approved by the responsible public agency amounts to granting a veto power over local land use decisions after a project is completed.

Other than through enforcement of private covenants, conditions and restrictions, adjoining homeowners have no power to approve or reject a project, although their input is usually sought by the public agency. In the Planning and Zoning Law (Gov. Code, § 65000 et seq.), the Legislature has enacted a scheme which severely restricts the ability of private citizens to challenge development approvals. With rare exceptions, only those issues raised by the challenger before the public agency during the approval process may be advanced in court (Gov. Code, § 65009), and strict time limits are specifically mandated to avoid the tremendous additional cost of delay and uncertainty to any property owner seeking to improve his or her property. (See, e.g., Gov. Code, § 65907 [court challenges to zoning decisions must be commenced within 90 days and are entitled to calendar priority]; Gov. Code, § 65921; Pub. Resources Code, § 21167 et seq.)[1]

---

[1]Similarly, "The Subdivision Map Act (Gov. Code, §§ 66410-66499.37) regulates the subdivision of real property and vests the power to regulate and control the design and physical improvements of a subdivision in the local governmental authority where the property is located. (*California Coastal Com.* v. *Quanta Investment Corp.* (1980) 113 Cal.App.3d 579, 588 [170 Cal.Rptr. 263].)" (*Adler* v. *Elphick* (1986) 184 Cal.App.3d 642, 646 [229 Cal.Rptr. 254].) Any action brought to challenge the approval of a subdivision must be

In establishing such restrictive limitations on the ability of citizens to attack a development approval, the Legislature has expressed a strong intent to provide for judicial remedies while ensuring that development will not be halted by the specter of lengthy litigation. Government Code section 65009 declares this intent: "(a)(1) The Legislature finds and declares that there currently is a housing crisis in California and it is essential to reduce delays and restraints upon expeditiously completing housing projects. [¶] (2) The Legislature further finds and declares that a legal action challenging a decision of a city, county, or city and county has a chilling effect on the confidence with which property owners and local governments can proceed with projects. Legal actions filed to attack, review, set aside, void, or annul a decision of a city, county, or city and county pursuant to this division can prevent the completion of needed developments even though the projects have received required governmental approvals. [¶] (3) The purpose of this section is to provide certainty for property owners and local governments regarding decisions made pursuant to this division."

The petitioners' action, brought long after the time for challenging the development, is tantamount to a back door challenge to the approvals previously obtained. The majority's approval of petitioners' fraud complaint creates a new tort and erects a new barrier to a development duly approved by the responsible public agency. The clear intent of the Legislature in establishing strict time limits was to assure that, after the period for judicial review, development could proceed. The majority's holding means that builders who have run the gauntlet of the time-consuming planning process and the post approval period for court challenges will now face new tort liability following completion of the project if any of the neighbors are unhappy with the result.

The harm claimed by the petitioners was caused by a land use decision made by the county in public hearings, not by the conduct of Southwest. No doubt petitioners would prefer to restore the Dana Point coastline to the pristine vista encountered by Richard Henry Dana more than 150 years ago. Today land use decisions are made by local agencies in noticed public hearings. A property owner who constructs an improvement in compliance with the approvals obtained does not commit a tort against its neighbors.

---

brought within 90 days of the approval by the public agency. (Gov. Code, § 66499.37.) Any action to challenge the environmental approvals for a development project must be brought within the time periods set forth in Public Resources Code section 21167, and the hearing on such a challenge must be given preference "to the end that all such actions shall be quickly heard and determined." (Pub. Resources Code, § 21167.1.)

The trial court's order sustaining the demurrer was correct. I would deny the writ.

The petition of real parties in interest for review by the Supreme Court was denied September 26, 1991.